IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,    )
                                   )
     Plaintiff,          )
                                   )
vs.                     )        No. 13-20127-JPM-dkv
                                   )
LEONARDO WILLIAMS,       )
                                   )
     Defendant.          )

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTIONS TO SUPPRESS

_____

Leonardo Davinci Williams ("Williams") is charged in a five-count third superseding indictment for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), possession of a firearm as a felon in violation of 18 U.S.C. § 922(g)(1), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). (D.E. 44.) These charges arise out of an undercover investigation by the Drug Enforcement Administration's ("DEA") Violent Crimes and Drug Task Force ("VCDTF") in Memphis, Tennessee, which led to the search of Williams's home on a search warrant, the stop of Williams's vehicle, and his arrest on September 20, 2012.

Now before the court is Williams's August 19, 2013 motion to suppress[1] physical evidence and oral statements that resulted from the allegedly illegal search of his home and stop of his vehicle. (Def.'s Mot. to Suppress, D.E. 19.) Williams also seeks to suppress physical evidence on the grounds that there is a chain of custody issue concerning the amount of cocaine recovered from the search of Williams's residence.[2] After two motions for extension to file a response were granted, the government filed a response on October 22, 2013. (Gov't's Resp., D.E. 27.) The motion was referred to the United States Magistrate Judge for a report and recommendation. (D.E. 20.)

Pursuant to the reference, the court held an evidentiary hearing on January 27, 2014. At the hearing, the government called one witness, Special Agent Mark Chism ("Agent Chism"), and introduced into evidence two exhibits: Agent Chism's affidavit in support of the search warrant, (Ex. 1), and the signed search warrant authorizing the search of Williams's residence, (Ex. 2). Williams introduced five exhibits into evidence: Agent Chism's affidavit of complaint for the search warrant, (Ex. 3), Williams's arrest ticket to the Shelby County

---

[1]   Since the filing of the instant motion, the court granted several requests for extensions of time and motions to continue, leading to the delay of the suppression hearing.

[2]   This chain of custody argument was not raised until the January 27, 2014 suppression hearing and was argued in Williams's amended motion to suppress, filed February 14, 2014 with leave of the court. (Am. Mot. to Suppress, D.E. 61.)

Jail, (Ex. 4), Agent Chism's Evidence Inventory Log detailing the items seized from the search of Williams's residence ("Agent Chism's Evidence Inventory Log" or "the Evidence Inventory Log"), (Ex. 5), the Memphis Police Department's ("MPD") Evidence Report ("the MPD Evidence Report" or "the Evidence Report"), (Ex. 6), and the Tennessee Bureau of Investigation's ("TBI") Official Chemistry Report ("the TBI Report"), (Ex. 7).

At the January 27 hearing, defense counsel explained that a discrepancy in the evidence was recently uncovered that might require a delay in the hearing for further discovery, an amendment to his motion to suppress, or some leniency in his questioning of Agent Chism. Specifically, an issue arose concerning the amount of cocaine that was recovered from the search of Williams's residence; the MPD Evidence Report lists 65.19 grams of cocaine and the TBI Report lists 43.86 grams of cocaine. In his third superseding indictment, however, Williams was only charged with possession and intent to distribute 19 grams of cocaine. (D.E. 44.) On the agreement of both parties, the court proceeded with the hearing in January and granted the defense leeway in questioning Agent Chism on cross-examination. After Agent Chism gave his testimony, the court granted defense counsels' request for additional time to gather evidence and call witnesses. The court also granted the defense's motion to file an amended motion to suppress. The

hearing was continued until March 10, 2014, and Williams submitted an amended motion to suppress on February 14, 2014. (Am. Mot. to Suppress, D.E. 61.)  The government responded on February 21, 2014.  (Def.'s Second Resp., D.E. 65.)

At the March 10, 2014 hearing, the government again called Agent Chism to testify, as well as Special Agent Michael Ciesliga ("Agent Ciesliga").  The government moved into evidence Exhibit 8, Agent Chism's September 21, 2012 Report of Investigation ("the Report of Investigation").  On April 7, 2014, Williams filed a post-hearing memorandum in support of his amended motion to suppress.  (Post-Hr'g Mem. in Supp. of Am. Mot. to Suppress, D.E. 74.)  The government did not file a post-hearing memorandum.

After careful consideration of the statements of counsel, the testimony of the witness, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motions to suppress be denied.

## I.   PROPOSED FINDINGS OF FACT

### A.   The Initial Undercover Investigation of Williams

The VCDTF's investigation of Williams began in September of 2012 when a confidential informant ("CI") informed Agent Chism that Williams was trafficking drugs.  Agent Chism, who testified at the hearing, is a special agent with the DEA's VCDTF and has

been with the DEA for ten years.  He has worked as an agent in the VCDTF since May of 2007.  In his position, he handles drug trafficking cases, gang-related cases, and weapons violations.  He has been the lead agent on cases on several occasions and acted as the lead agent in Williams's case.

As Agent Chism testified, he has worked with the CI who contacted him about Williams off and on for about five years.  The CI — who had been arrested four to five years ago for a drug offense and agreed to provide information in the future — has been an informant in several cases involving drugs (mostly cocaine) and weapons.  Almost every case in which the CI has cooperated has led to arrests, seizures, and prosecutions of drug crimes.  Agent Chism testified that typically the CI contacts him first with a tip, as the CI did in this case.  On one occasion, however, DEA agents contacted the CI to have him work undercover in an investigation of a topless night club, which closed when it was discovered, with the CI's cooperation, that drug offenses were being committed there.  In sum, Agent Chism's testimony concerning the CI was that he was a reliable source, and the court found this testimony credible.[3]

---

[3]    On cross-examination, Agent Chism agreed that CIs usually contact an agent about someone against whom they have a bias or "bad blood."  However, he was not aware of any bias or bad blood in the present case.

In the CI's conversation with Agent Chism about Williams in early September of 2012, he explained to Agent Chism that he had recently[4] been at the home of Williams at 1870 Dupont Avenue in Memphis, Tennessee, where he saw a large amount of cocaine and one assault rifle.[5] On September 13, 2012, the CI came into the DEA office to place a recorded phone call to Williams. Agent Chism was present as the CI called Williams, who agreed to sell the CI an "eight ball" of cocaine (approximately 3 grams). Agent Chism verified that the phone number used to call Williams matched public records. Agents then wired the CI with audio and visual surveillance, and the CI went to Williams's home to purchase the agreed-upon drugs with funds supplied by the DEA.[6] When the CI arrived, Williams was not present, so the CI called Williams, who told him to wait there because he was at the store. Williams arrived, and the CI and Williams entered the home together and exchanged the cocaine and money. In watching the surveillance, the agents were able to confirm that 1870 Dupont Avenue was the home of Williams, and Agent Chism also verified the address with MLGW records. Agent Chism's field test of the substance obtained in the exchange tested positive

---

[4]    Agent Chism could not remember how long ago the CI had been at Williams's residence when he contacted Agent Chism, but he stated that he knew it was some time in the recent weeks.

[5]    In the agents' subsequent search of Williams's home, the assault rifle was never found.

[6]    These funds were photocopied by the agents but were never recovered from Williams.

for cocaine, and he thereafter took the evidence to the MPD's property room to be stored.  The MPD property room's field test likewise tested positive for cocaine.

On September 18, 2012, the agents and the CI performed the same scenario: the CI placed a recorded phone call to Williams and agreed upon a sale of cocaine, and the agents surveilled the CI as he bought a couple of grams of cocaine.  This time, the CI also asked Williams about guns, and Williams stated that he did not need any.  After the sale, Agent Chism took the purchased substance to the property room, where a field test tested positive for cocaine.  Agent Chism thereafter logged the evidence into the evidence room, which keeps a log of who has retrieved and returned the evidence.  Agent Chism testified that he was the only one with a key to this evidence.

The following day, on September 19, 2012, Agent Chism drafted an affidavit in support of a search warrant that detailed the CI's two purchases of cocaine from Williams on September 13 and 18.  (*See* Ex. 1.)  Judge Coffee of the Criminal Court of Shelby County, Tennessee thereafter signed a search warrant for the search of Williams's residence at 1870 Dupont Avenue for "cocaine, weapons, drug paraphernalia, U.S. currency, receipts, notes, ledgers, books, records, and/or all other materials, evidence of violation of T.C.A. § 39-17-417." (Ex. 2.)

B.    <u>Stop of Williams's Vehicle and the Execution of the Search</u>
<u>Warrant</u>

A team of eight to ten VCDTF agents executed the search warrant on September 20, 2012.[7]  Agent Chism first drove by the residence of Williams, but Williams's vehicle was not in the driveway, so the agents stationed their vehicles within a half to quarter mile distance from the residence while they waited for Williams to arrive.  According to Agent Chism, it is safer for both the agents and the defendant if the agents execute a search warrant when the person is present because of the risk of gun use; it also ensures less property damage to the defendant's residence.

As the agents surveilled the street, they saw Williams's vehicle turn from Overton onto Dupont Avenue and drive in the direction of his house.  Agent Chism testified that he had already researched Williams's license in the Department of Safety's portal and discovered that Williams had a revoked or suspended license at that time.  Another agent stopped Williams's vehicle and placed him under arrest, as Agent Chism looked on from a different vehicle directly behind the stop. Agent Chism testified that Williams's revoked or suspended license was the reason that the agents stopped his vehicle and placed him under arrest, but the agents also had probable cause

_____

[7]    Though Agent Chism was the lead agent, two supervisors were also present for the search.

to arrest him for his prior drug sales to the CI. Agent Chism could not remember whether he saw the agent who stopped Williams's vehicle ask for Williams's license and proof of insurance; however, Agent Chism stated that a TBI agent was present as part of the team of agents and may have verified that Williams's license was still revoked or suspended.

At the March 10, 2014 hearing, Agent Ciesliga verified that he was in the police vehicle that stopped Williams's car. He stated that the basis of the traffic stop was driving on a suspended license and confirmed that officers had checked the status of Williams's license that same morning. He did not personally take possession of Williams's license or cell phone during the stop, but he recalled that five agents were involved in the stop. If those items had been seized as evidence, he or Agent Chism would have received it, but he did not recall receiving them. Agent Ciesliga further stated that although Williams's suspended license was the basis of the stop, the officers also wanted to detain Williams before they executed the search for safety reasons, as the CI had seen a high-powered rifle in Williams's residence.

After Williams was stopped and placed under arrest, the agents walked Williams into the living room of his house, where

he sat as six to seven agents searched the residence.[8]  As the case agent, Agent Chism made assignment to the officers as to which rooms they should search.  Agent Chism handled the canine and entered the home first.  He also designated which officers should act as evidence custodian and photographer: Agent Ciesliga was the evidence custodian, and Special Agent Flint ("Agent Flint") was the photographer.  As the other officers searched their designated rooms and found items of evidentiary value, Agent Ciesliga was called upon to maintain custody of the evidence, and Agent Flint photographed it.

Agent Chism and Agent Ciesliga both testified about the procedure the evidence custodian follows in taking custody of evidence found in a search.  The custodian must keep a log of the evidence he collects, in which he identifies who found it, where it was found, and the suspected contents.  After the evidence is photographed, the custodian seals it in bags, marks the bag, and maintains custody of it throughout the execution of the search.  After the completion of the search, the custodian transports the evidence to the office and secures it in an evidence safe.  Agent Ciesliga testified that this was the procedure he followed during the September 20, 2012 search.

---

[8]    Agent Chism recalled that Williams's residence was a small one or two bedroom house.  It was fully furnished, and the master bedroom had a bed in it.  He did not recall whether the spare room had a bed.  When asked whether another person could have lived in the home, Agent Chism answered yes.

When Agent Chism began his search of Williams's residence with the canine, he was particularly interested in a small cabinet in the kitchen because he received information from the CI that Williams went to that cabinet during his cocaine sales. The canine alerted to the cabinet, and Agent Chism found a bag of white powder behind it. The bag holding the powder was contained within another plastic Kroger bag. The interior bag held white powder, which tested positive for cocaine in Agent Chism's field test.

The other agents found various small bags containing suspected powder and crack cocaine, a handgun, currency, scales, and other paraphernalia showing intent to sell cocaine during their search of the residence.[9] The bag within a bag that Agent Chism recovered from behind the kitchen counter contained the largest amount of suspected cocaine. After the search was completed, Williams was taken to the VCDTF's office at Mullins Station about fifteen minutes away, where he was Mirandized verbally and in writing and questioned. Agent Chism estimated that thirty minutes to an hour passed between the time that Williams arrived at the office and was Mirandized and interviewed. He testified that Williams did not appear under the influence of anything, stated that he understood his rights, and did not indicate that he could not read. Agent Chism also

---

[9]    The full list of evidence is located at Exhibit 5.

noted that Williams — who was forty years old at the time — had a long record of arrests. During his interview, Williams agreed to give a statement in which he declared that the drugs were for personal use and that his friends who frequented the house had left some of the drugs there, too. He also declared that no one lived at 1870 Dupont Avenue except himself. Agent Chism characterized Williams's statement as an effort to avoid an intent to sell cocaine charge; his testimony indicated that he did not believe Williams.

During cross-examination of Agent Chism, defense counsel inquired into several documents executed by Agent Chism and by other agencies involved in the case. In particular, Williams's counsel asked about Agent Chism's Affidavit of Complaint supporting the search warrant, (see Ex. 3), and Williams's arrest ticket to the Shelby County Jail — also executed by Agent Chism, (see Ex. 4). Agent Chism admitted that neither document charged Williams with driving on a suspended or revoked license, failure to present proof of insurance, or for his prior drug sales; rather, both documents charged Williams with possession with intent to sell cocaine, being a felon in possession of a handgun, and possession of a handgun during the commission of a dangerous felony. He testified that although Williams was arrested for a suspended or revoked license, he decided to charge Williams with these drug- and firearm-related crimes

because the suspended license charge was superfluous at that point.  Agent Chism agreed that Williams was not booked into Shelby County Jail for his prior drug sales.

C.  Chain of Custody of the Evidence After the Search and Issues Related to Inconsistent Evidence Logs and Reports

At both evidentiary hearings, defense counsel questioned Agent Chism about the discrepancies between Agent Chism's Evidence Inventory Log, (Ex. 5), the MPD Evidence Report, (Ex. 6), and the TBI Report, (Ex. 7), and Agent Chism's Report of Investigation, (Ex. 8).  Agent Chism created his Evidence Inventory Log on September 20, 2012 and his Report of Investigation on September 21, 2012.  Agent Ciesliga thereafter delivered the evidence to the MPD property room, which generated its own Evidence Report on September 21, 2012.[10]  In March of 2013, Agent Chism checked the evidence out of the MPD property room and took it to the TBI lab, which tested the evidence and issued its report on May 20, 2013.

1.  *Chain of Custody*

On the subject of chain of custody, Agent Chism and Agent Ciesliga testified that the evidence obtained from the search of Williams's home was taken by Agent Ciesliga from the scene of the search directly to the evidence safe at the VCDTF's office

[10]  The Evidence Report is issued as a receipt to the officer who brings the evidence to the property room.  The undersigned found the MPD Evidence Report properly authenticated by the testimony of Agent Chism and Agent Ciesliga.

at Mullins Station.   The "safe" is in fact an old post office box.   Once an item is dropped in the safe, it can only retrieved by someone with a key.   One person has a key to the safe — the supervising officer, Special Agent David Lidel ("Agent Lidel") — or if he is out of town, Agent Chism has a key.   Agent Ciesliga testified that on September 21, 2012, he asked his supervisor to unlock the evidence safe for him, Agent Ciesliga retrieved the evidence from it, and Agent Ciesliga transported the evidence to the MPD property room for testing.

Agent Ciesliga was present in the MPD property room as the property technician performed tests and weighed the evidence. Though he makes frequent trips to the MPD property room, Agent Ciesliga recalled that in this case, the technician weighed the powder cocaine separately from the crack cocaine.   He stated that the technician took the gross weight of the evidence, as the MPD property typically does for its evidence reports.   This means that the technician weighed the evidence in the bags in which it was contained.   Agent Chism confirmed that the MPD uses gross weights in its measurements, unless asked to do otherwise. As to the bag within the bag found behind the kitchen cabinet, Agent Ciesliga could not recall whether it was weighed inside the larger Kroger bag.   Both Agent Chism and Agent Ciesliga noted that the MPD property room does not always test the substances in every single bag.

As Agent Chism testified, the TBI Report was generated at his request.  In March of 2013, Agent Chism retrieved the evidence from the MPD property room to take it to the TBI lab. He testified that the evidence was sealed by the MPD in a bag, which he collected and delivered to the TBI without altering it or opening it.  He could not see how the evidence was packaged inside the sealed bag.  The TBI performed a forensic analysis of the evidence and issued a report on May 20, 2013.  After its analysis was complete, Agent Chism picked up the evidence from the TBI lab, again in a sealed bag, and returned it to the MPD property room.  He testified that neither he, nor anyone else in his presence, tampered with the evidence, and the bag remained sealed.

    2.   *Discrepancies in Various Reports*

Agent Chism's Evidence Inventory Log and the MPD Evidence Report are somewhat consistent: they both list a handgun, a magazine, bullets, a blue sunglasses case, and digital scales. However, whereas Agent Chism's Evidence Inventory Log lists the cocaine as six separate bags of cocaine, the MPD Evidence Report lists the cocaine as two exhibits, 49.7 grams of powder cocaine and 15.49 grams of crack cocaine.  This is consistent with Agent Ciesliga's testimony that the MPD property lab weighed the powder cocaine separately from the crack.  The total amount of cocaine listed in the MPD Evidence Report is 65.19 grams.

Additionally, in Agent Chism's Evidence Inventory Log, he inventoried $727 in currency, a marijuana pipe, a debit card, and paperwork in his Evidence Inventory Log, which were not listed in the MPD Evidence Report. Agent Ciesliga explained that the currency would have been transferred to a check to be put into the VCDTF escrow account with other pending seizures. As to the paperwork, Agent Ciesliga testified that it's up to the case agent to determine whether the paperwork seized is valuable. He could not speak to the marijuana pipe and the debit card.

Discrepancies in the way evidence was listed and weighed were also found in the TBI Report, entered into evidence as Exhibit 7. The TBI report lists five lettered exhibits detailing the substances detected in the evidence obtained from Williams's home. When asked why the TBI Report lists five exhibits when there were six bags of cocaine, Agent Chism explained that the TBI does not always count exhibits the same way that he does. The TBI counts the evidence according to however the MPD packages it. Agent Chism also testified that sometimes the TBI does not test all of the exhibits that are sent to them.

The TBI Report returned the following results: 20.67 grams of powder was not a controlled substance; 13.31 grams of rock-like substance was cocaine; 6.31 grams of powder was cocaine;

2.61 grams of tablets was MDMA (Ecstasy); and 0.96 grams of powder was cocaine. Thus, the total amount of cocaine it calculated was 20.58 grams. The TBI detected for the first time in the investigation that some of the evidence submitted was not a controlled substance, and some of it was Ecstasy, rather than cocaine.

When Agent Chism received the TBI Report, he was surprised by several findings. The report found that Exhibit 001-a — what Agent Chism described as the large bag of cocaine within the Kroger bag — tested negative for controlled substances and weighed 20.67 grams; however, both his and the MPD's field test of the same exhibit had tested positive for drugs. The canine that accompanied him had also alerted to it. Agent Chism was further surprised that two of the exhibits, Exhibits 001-d and 001-e, tested positive for ecstasy rather than cocaine. Finally, Agent Chism was confused by the TBI Report's description of the form of the cocaine. Agent Chism did not recall that any of the substances recovered in the search came in tablet form, yet the TBI report describes Exhibit 001-d as "Tablets."

One final report was entered into evidence for comparison of the evidentiary exhibits — Agent Chism's September 21, 2012 Report of Investigation located at Exhibit 8. In his Report of Investigation, Agent Chism lists evidentiary exhibits according

to the bags and containers in which they were found. Agent Chism testified that Exhibit 3 in his Report of Investigation, described as 37.7 grams of suspected cocaine in white plastic bag, was the bag within a bag found behind the cabinet in Williams's kitchen. This was the same piece of evidence as the TBI Report's Exhibit 001-A, which weighed only 20.67 grams. Agent Chism explained that for his Report of Investigation, he took the gross weight and weighed the evidence in the bags or containers in which they were contained.

   3.   *Agent Chism and Agent Ciesliga's Follow-Up Visit to the MPD Property Room*

In October of 2013, Agent Chism arranged with the MPD to review the evidence again because he was confused and worried about the results of the TBI report, and he did not want to inaccurately charge Williams. He was "dubious" of the fact that the bag found in the kitchen cabinet tested negative for cocaine because in his twenty-four years of experience, he had never had that happen after a positive field test. Major Richard Borgers and Agent Ciesliga came with him to personally observe and to ensure a controlled environment. A lab technician was also present. During this visit, the large bag of cocaine was re-tested (Exhibit 001-a of the TBI Report), and returned negative results for cocaine. Agent Ciesliga testified that he also handled Exhibit 001-d, the bag of ecstasy described as

"Tablets," to physically manipulate it while still inside the bag. Though the bag largely contained powder, Agent Chism felt two or so tablets that were mostly crushed amid the powder, which explained why the TBI labeled it as tablets.

Agent Chism recalled that the bags that the TBI returned to the MPD property room were the original bags that the agents recovered from Williams's residence during the search. He testified that he did not weigh the bags to see if they were the cause of the 17 gram difference in weight between his Report of Investigation and the TBI Report. He assumed that most of the discrepancy in weight was caused by the weight of the bags and potentially some moisture leave. No paperwork or report was generated from this visit because, as explained by Agent Chism, the evidence never left the property room.

Agent Ciesliga corroborated Agent Chism's testimony. He stated that at this second testing in the MPD property room, only the large bag of cocaine found behind the kitchen cabinet was re-tested. He did not recall whether Agent Chism or the property technician handled the large bag of cocaine.

## II.  PROPOSED CONCLUSIONS OF LAW

Williams moves to suppress physical and oral evidence that resulted from the search of his home on September 20, 2012 on the basis that the underlying search warrant was invalid; the

stop of his vehicle was improper; and the indictment was based on physical evidence that was mishandled, tainted, or unsecured.

A.  <u>The Search Warrant</u>

Williams argues that the search warrant authorizing the search of his home was based upon flawed, unreliable information from Special Agent Chism and the CI.  (Def.'s Mem. in Supp. of Am. Mot. to Suppress, D.E. 74 at 2.)   He asserts that there is no evidence of the veracity of the CI, and that the CI gave misinformation — namely, that a high-powered rifle was in Williams's residence and that cocaine could be found behind the kitchen cabinet.  A rifle was never found, and the powder substance behind the cabinet did not test positive for drugs. Further, the CI was given marked or photocopied funds to make drug purchases, but the search of the house did not reveal these funds.  As a result, Williams argues that Judge Coffee did not have sufficient probable cause to issue the search warrant. (*Id.* at 2-3.)

Probable cause to issue a search warrant exists where "there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place."  *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)(quoting *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985)).   In evaluating whether probable cause exists where a confidential informant provides

the underlying information, a judicial officer may rely on hearsay evidence, but "must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances." *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003). As noted in the Supreme Court's *Illinois v. Gates*, 462 U.S. 213 (1983) decision:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying the hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238.

Warrants carry a "presumption of validity," *Franks v. Delaware*, 438 U.S. 154, 171 (1978), and truthfulness in a warrant "does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily," *id.* at 165. Rather, it means that the "information put forth is believed or appropriately accepted by the affiant as true." *Id.* The affiant should provide in the warrant affidavit the "particular facts and circumstances underlying the existence of probable cause" that would allow a judicial officer to independently evaluate the matter. *Id.*

In the present case, Agent Chism's sixteen-paragraph affidavit in support of the search warrant provides more than ample particularized facts and circumstances to support Judge Coffee's issuance of the search warrant on probable cause. (*See* Ex. 1.) The affidavit describes Agent Chism's background and experience, the CI's tip based on his visit to Williams's residence, information regarding the reliability of the CI, and the CI's undercover purchases of cocaine from Williams under the surveillance of the VCDTF.

As to the reliability of the CI, the affidavit specifically states that the CI has cooperated with the VCDTF in prior investigations, which led to the seizure of drugs and illegal weapons, successful arrests and prosecutions of individuals, and the closure of a topless night club. The affidavit also states in great detail each step of the investigation of Williams, including the CI's recorded phone calls to Williams's phone number; Williams's agreement to sell the CI an "eight ball" of cocaine; Agent Chism's verification of Williams's phone number and address against public records; the CI's surveilled purchase of cocaine at the residence of Williams on two occasions — one within the last seventy-two hours; and Agent Chism's presumptive field tests of the purchased substances that tested positive for cocaine. Though the high-powered rifle, the cocaine behind the cabinet, and the marked funds were not found during the search

of Williams's residence, this does not undercut the overwhelming evidence in support of Agent Chism's affidavit, particularly the cocaine sales witnessed via surveillance and the positive field test of the cocaine obtained in the sale.

Based on the totality of these circumstances, Judge Coffee properly found that there was a fair probability that contraband or evidence of a crime would be found at Williams's residence. The court therefore recommends that Williams's motion to suppress physical evidence and oral statements resulting from the issuance of the search warrant be denied.

B.   The Stop of Williams's Vehicle

Williams further argues that the stop of his vehicle on September 20, 2012 was not supported by probable cause because no traffic violation had occurred.  The government counters that Williams was driving *toward* his home at the time of his stop, and thus, he was detained within the "immediate vicinity" of his residence pursuant to *Michigan v. Summers*, 452 U.S. 692 (1981) and *United States v. Bailey*, 133 S. Ct. 1031 (2013).  Further, the government argues that his detention and arrest were supported by probable cause based on his prior surveilled drug sales.  At the January 27, 2014 hearing, Agent Chism testified that the stop of Williams's vehicle was based on probable cause for his arrest due to his revoked or suspended license; he further testified that, in any event, the officers had probable

cause to arrest Williams for his two prior cocaine sales. Agent Ciesliga corroborated Agent Chism's testimony at the March 10, 2014 hearing, testifying that he participated in the stop of Williams's vehicle and that the basis of the stop was Williams's suspended license.

The court finds that the stop of Williams's vehicle was proper because the agents had probable cause to arrest Williams based on his revoked or suspended license. Though it is possible that the officers invoked the "immediate vicinity" doctrine articulated in *Summers*, 452 U.S. at 692 and *Bailey*, 133 S. Ct. at 1031 to detain Williams, the testimony of Agent Chism showed that the agents in fact stopped Williams's vehicle to arrest him for his license status.[11]

---

[11]    Further, the government has not offered evidence that Williams was detained in the "immediate vicinity" of his home by describing the physical proximity of Williams to the residence or by justifying it on the three grounds articulated in *Summers* and *Bailey*. The Supreme Court's decisions in *Summers* and *Bailey* recognize that occupants found within or immediately outside a residence at the time of the execution of a search warrant can be detained by police. *Bailey* 133 S. Ct. at 1038. The Court has established three justifications for "immediate vicinity" detentions: "officer safety, facilitating the completion of the search, and preventing flight." *Id.* The doctrine extends only to those occupants that "pose[] a real threat to the safe and efficient execution of a search warrant" based on their physical nearness to the premises to be searched. *Id.* at 1042. "Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe." *Id.*

"Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993)(quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). Further, "[t]he establishment of probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Barrett*, 890 F.2d 855, 861 (6th Cir. 1989)(quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

Agent Chism's testimony was uncontroverted that the Department of Safety's portal indicated Williams had a revoked or suspended license at the time of his stop, and the court found his testimony to be credible. Agent Ciesliga likewise testified that the agents checked the status of Williams's license on a database the morning of September 20, 2012, and that he and a team of agents pulled over Williams based on his revoked or suspended license. The status of Williams's license on the database gave the agents reasonable grounds for belief of Williams's guilt in driving a vehicle with a revoked or suspended license and gave rise to probable cause for his arrest. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003)(quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979))(defining probable cause for an arrest as "'a reasonable ground for belief of guilt,' and that belief of guilt must be

particularized with respect to the person to be searched or seized.'"). Although it is not clear whether the agents who stopped Williams asked to see his license, Williams's license status was checked through a reliable source, and the defense has presented no evidence that Williams's license was *not* suspended or revoked.

Further, Agent Chism testified that although the agents had probable cause to stop and arrest Williams due to his license, Williams was booked into jail for possession of drugs and weapons because the license charge was superfluous after the agents executed the search of Williams's residence. (*See* Ex. 4.) The fact that Williams was ultimately charged with possession of cocaine and firearms does not tend to disprove Agent Chism and Agent Ciesliga's testimony that Williams was stopped and arrested for his revoked or suspended license. Accordingly, the court recommends that Williams's motion to suppress physical evidence and oral statements resulting from the stop of Williams be denied.

C.    Issue Concerning the Amount of Cocaine Recovered from the Search of Williams's Residence

Finally, Williams raises a chain of custody argument, asserting that the differing amounts of cocaine reported in Agent Chism's Evidence Inventory Log, the MPD Evidence Report, the TBI Report, and Agent Chism's Report of Investigation show

that the amount of cocaine seized is unreliable. Defense counsel expressed concern at the January 27, 2012 hearing that evidence of 65.19 grams of cocaine versus 43.8665 would affect his client's case and the jury's perception of Williams. (*See* Ex. 6, 7.) These concerns are outlined in Williams's amended motion to suppress. (*See* Def.'s Mem. in Supp. of Am. Mot. to Suppress, D.E. 74 at 5.) The government's third superseding indictment, however, only charges Williams with possession with intent to sell 19 grams of cocaine. (D.E. 44.) Because the government only charges Williams with an amount of cocaine that all of the reports agree was seized from the search, the court finds that the total amount of cocaine seized in excess of 19 grams is not at issue in the trial phase of this case. Should the government argue at the sentencing phase of trial that more than 19 grams of cocaine was found at Williams's residence, the defense's chain of custody argument would be appropriate. Accordingly, the court finds that there is no chain of custody issue at this time.

Even if the defense's chain of custody argument were at issue at this time, the court found credible Agent Chism and Agent Ciesliga's testimony that explained why the various reports describe the exhibits differently and contain different measurements. As both agents testified, the MPD property room and the TBI often count exhibits differently, and sometimes, the

TBI does not perform forensic analysis of exhibits submitted. This would explain why the TBI found the controlled substance, Ecstasy, but the MPD lab did not.

Additionally, the procedures of the various labs account for the differences in the measurements. The MPD property room measured the exhibits by their gross weight, and it weighed the powder cocaine together and the crack cocaine together. This explains why the MPD Report lists a total of 49.7 grams of powder cocaine and 15.49 grams of crack cocaine, without differentiating between individual bags of controlled substance. Agent Chism, on the other hand, listed the evidence in his own Report of Investigation, (*see* Ex. 8), according to the bags in which it was found. He also took the gross weight of the evidence, but weighed each bag separately. Notably, when Agent Chism's individual measurements of powder cocaine are added together,[12] they total to 49.7 grams — the same measurement that the MPD Evidence Report calculated for the gross weight of the powder cocaine. Agent Chism lists that 15.49 grams are suspected crack cocaine, which also corresponds with the MPD Evidence Report's measurement of crack cocaine.

---

[12]    The powder cocaine amounts are listed in Exhibits 3 through 5 of Agent Chism's Report of Investigation, located at Exhibit 8.  Exhibit 3 lists 47.7 grams, Exhibit 4 lists, 4.46 grams, and Exhibit 5 lists 7.54 grams.

The TBI Report indicates that the TBI measured and tested each individual exhibit separately, dividing the exhibits into powder non-controlled substance, rock-like substance cocaine, powder cocaine, and tablets of Ecstasy. Agent Chism testified that he believed the 17 gram difference in weight between TBI's Exhibit 001-a and his Report of Investigation's Exhibit 3, which both refer to the bag within a bag found behind Williams's cabinet, was due to the weight of the bags. Presumably then, the TBI does not take gross weights, but actually removed the bags to calculate the weight. This would explain why its weight measurements are less.

Finally, despite the TBI's different findings in its report — particularly its finding that the large bag of powder was not a controlled substance and that some of the evidence was actually Ecstasy — the court finds no reason to suspect that the evidence was tampered with at any stage of the investigation. The testimony is uncontroverted that the chain of custody of the evidence was secure. Agent Chism testified that he, nor anyone else that he saw, tampered with the evidence. At each stage of the investigation, the evidence was kept in a locked place in sealed bags. As the evidence custodian, Agent Ciesliga verified that he maintained custody of the evidence during the search and secured it in the evidence safe at the VCDTF's office. On September 21, 2012, he removed the evidence, along with the only

supervisor who had a key to the safe, took it to the MPD property room, and watched as the MPD lab tested the evidence. The evidence was maintained in a sealed bag at the MPD property room until March of 2013, when Agent Ciesliga picked it up in its sealed package and delivered it to the TBI without opening it. Agent Ciesliga later picked up the evidence from the TBI, again in a sealed package, and took it back to the MPD property room, where it remained until Agent Chism and Agent Ciesliga's follow-up visit. None of these circumstances suggest foul play or lack of care in handling the evidence.

Agent Chism's follow-up visit to the MPD property room after the TBI issued its report further explained how the same evidence could be described differently by each agency: though Agent Chism would have described the substance as a powder, there were in fact two partly crushed tablets amid the powder. This led to the TBI Report's analysis of the substance as "Tablets." At this return visit to the property room, Agent Chism performed another field test of the large bag of cocaine and received a negative result, which verified the TBI's findings. Though Agent Chism's initial field test and the MPD's own test returned a positive result for cocaine, the discrepancy in results does not, standing alone, make the evidence unreliable absent some evidence of mishandling. Here, there is none.

The court is also unconvinced by Williams's argument that Agent Chism and Agent Ciesliga's follow-up visit to the MPD property room suggests evidence of foul play. Williams calls attention to Agent Chism's testimony concerning this visit versus Agent Ciesliga's testimony. Agent Chism testified that the MPD lab technician, at his request, re-tested the large bag of cocaine, and Agent Chism manipulated the exterior of the bag of Ecstasy to see whether it contained tablets. (*See* Jan. 27, 2014 Hr'g Tr., D.E. 71 at 76:11-16; Mar. 10, 2014 Hr'g Tr., D.E. 72 at 40:4-20.) Agent Ciesliga testified that he saw the large bag of cocaine re-tested in the MPD property room, but he did not know whether Agent Chism or the lab technician handled the bag of cocaine. (*See* Mar. 10, 2014 Hr'g Tr., D.E. 72 at 77:18-78:20.) The court is not willing to assume that because Agent Ciesliga did not know whether Agent Chism or the lab technician handled the evidence, the evidence is somehow unreliable. Further, defense counsel's line of questioning of Agent Ciesliga concerned the large bag of cocaine and does not speak to the bag containing Ecstasy. The testimony of both agents reflects that it was a secure environment, with at least three officers present and one property technician present in the room. Williams has not come forward with any evidence that the evidentiary exhibits were tainted or mishandled.

In sum, the court finds that Agent Chism and Agent Ciesliga's testimony clarified the reports' differences and finds their testimony regarding the secure chain of custody to be reliable.

## III. RECOMMENDATION

For the reasons expressed above, it is recommended that Williams's motion and amended motion to suppress be denied.

Respectfully submitted this 19th day of May, 2014.

s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE
NOTICE

Within fourteen (14) days after being served with a copy of this report and recommended disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within fourteen (14) days after being served with a copy. FED. R. CIV. P. 72(b)(2). Failure to file objections within fourteen (14) days may constitute a waiver of objections, exceptions, and further appeal.